[No. C009149. Third Dist. Mar. 31, 1992.]

CHARLES BROMME, Plaintiff and Appellant, v.
PETER C. PAVITT, Defendant and Respondent.

## COUNSEL

Schleicher & Sargeant, Estelle A. Schleicher and Bridget Baynes for Plaintiff and Appellant.

Schuering, Zimmerman, Scully & Nolen, Leo H. Schuering, Jr., and John J. Sillis for Defendant and Respondent.

Horvitz & Levy, S. Thomas Todd, Daniel J. Gonzalez and Lisa Perrochet as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**SCOTLAND, J.**—Defendant was decedent Joan Bromme's physician from 1979 until her death in 1984. In June 1980, Bromme complained of abdominal pain, but defendant did not diagnose its cause. Following her renewed complaints in September 1981, it was determined that Bromme had colon cancer. After Bromme's death, her husband (plaintiff) brought this wrongful death action against defendant.

Evidence at trial suggested that before June 1981 it was medically probable the cancer, if detected, could have been treated successfully. After that time, successful treatment became medically improbable, i.e., the chance of success was less than 50 percent. At the close of plaintiff's case-in-chief, the trial court granted defendant's motion for partial nonsuit which precluded the jury from considering any alleged negligent acts by defendant after June 1981. The trial court reasoned "this is a [wrongful] death case" and "[i]t's more probable that after June of [1981] the cancer killed her than anything the doctor failed to do." The jury returned a verdict for defendant on the allegations of negligence through June 1981.

On appeal, plaintiff claims the trial court erred in granting the partial nonsuit because "California recognizes a cause of action for wrongful death even where the decedent had a less-than-50 percent chance for survival." Plaintiff is wrong. As we shall explain, a plaintiff who alleges a statutory cause of action for wrongful death arising from medical negligence must

prove by reasonable medical probability based on competent expert testimony that a defendant's acts or omissions were a substantial factor in bringing about the decedent's death. Where the alleged negligence relates to the failure to diagnose and treat a potentially terminal condition, a plaintiff fails to satisfy the requisite causation if the evidence shows the decedent did not have a greater than 50 percent chance of survival had the defendant properly diagnosed and treated the condition.

Plaintiff also contends the partial nonsuit was improper because: the jury should have been allowed to determine whether, if defendant had properly diagnosed and treated her condition, Bromme would have been among the minority who survive the type of cancer she suffered rather than the majority who do not; the trial court's ruling erroneously required plaintiff to prove defendant was *the* proximate cause of Bromme's death rather than *a* proximate cause of the death; and the court wrongly selected June 1981 as the last point at which defendant's alleged negligence could have caused Bromme's death. In addition, plaintiff contends the trial court erred in instructing with BAJI No. 3.75 rather than BAJI No. 3.76 concerning defendant's alleged negligence through June 1981. Only the last contention has merit, but we shall conclude the instructional error was harmless. Accordingly, we will affirm the judgment.

## Facts and Procedural Background

Summarized most favorably to plaintiff (*Freeman* v. *Lind* (1986) 181 Cal.App.3d 791, 799 [226 Cal.Rptr. 515]), the evidence is as follows:

On June 6, 1980, Bromme complained to defendant about abdominal pain, constipation, and "difficulties with food." After upper gastrointestinal and gallbladder studies appeared normal, defendant made no further effort to diagnose Bromme's complaints. He recommended she drink fruit juices and take Metamucil.

In February and March 1981, Bromme saw defendant for the removal of a cyst. There is no indication she complained about abdominal pain or bowel problems during these visits.

When Bromme saw defendant on September 10, 1981, he recorded in her chart that she was "[i]n today with a year's history of abdominal pain." Bromme complained of constipation and pencil-thin stool. Defendant scheduled a barium enema X-ray study of Bromme's colon and planned a sigmoidoscopy to visually inspect the colon's interior.

Defendant performed the sigmoidoscopy one week later. However, an obstruction of the colon prevented a complete examination. Defendant believed the obstruction was caused by a spasm.

That same day, Dr. Heffernon, a radiologist, performed the barium enema examination. He concluded the obstruction "probably" was an adenocarcinoma (cancer) of the colon.

Based on Dr. Heffernon's finding, defendant referred Bromme to Dr. Imperato, a gastroenterologist, who saw her the same day, September 17, 1981. Dr. Imperato attempted to perform a sigmoidoscopy, but residual barium from the X-ray process precluded him from seeing anything. A few days later, he repeated the procedure but Bromme fainted, and Dr. Imperato was forced to perform mouth-to-mouth resuscitation. Bromme revived within seconds but was very frightened, so the examination was terminated. Dr. Imperato wanted to do the procedure again in a hospital, but Bromme was unwilling to repeat it. Dr. Imperato and defendant discussed Bromme's fainting episode and unwillingness to undergo further tests.

Defendant next saw Bromme on November 2, 1981, when she and plaintiff received flu shots for a trip to China. As to the bowel problems, plaintiff testified that defendant told Bromme he "thought she had endometriosis, and it could wait." Defendant explained that endometriosis can grow around a bowel and "choke it off, restrict it," and that the condition could be treated with surgery or birth control pills after her trip.

When she and plaintiff returned from China, Bromme was constipated and vomiting so plaintiff took her to a hospital. Bromme was referred back to defendant. When Bromme saw defendant, he was not concerned and suggested she may have picked up a "bug" in China.

On December 28, 1981, defendant admitted Bromme to the hospital. Surgery on January 4, 1982, revealed she had colon cancer rather than endometriosis. The tumor and a portion of the colon were removed, and a colostomy was performed.

After surgery, plaintiff and Bromme learned for the first time that she had cancer. In November 1982, they learned the September 1981 barium enema study had shown a probability of cancer.

The pathology report revealed the cancer had invaded the full thickness of the bowel wall and had spread to surrounding lymph nodes. The report also revealed the surgeons had not removed all of the cancerous portion of the colon. A second surgery to correct that problem was performed in February 1982. In November 1982, the cancer metastasized to Bromme's right ovary. Both ovaries, the uterus, and the cancerous mass were removed. The cancer later metastasized to Bromme's lungs, causing her death in 1984.

On August 13, 1985, plaintiff filed his complaint. As Bromme's heir, plaintiff alleged a cause of action for wrongful death. (Code Civ. Proc., § 377.)[1]

At trial, Dr. Leon Schimmel, an obstetrician and gynecologist, and Dr. Barry Marfleet, a family practitioner, testified defendant's failure to diagnose the most likely cause of Bromme's abdominal pain in June 1980 was below the standard of care. Because the upper gastrointestinal and gallbladder studies proved negative, defendant should have ordered a stool test and lower gastrointestinal X-ray in 1980, not 1981. Moreover, defendant's failure to record important information on Bromme's chart misled subsequent physicians to conclude that Bromme had endometriosis. Dr. Marfleet testified defendant's failure to properly evaluate Bromme's complaints of abdominal pain in 1980 was a likely cause of the failure to timely diagnose the colon cancer. Because Dr. Imperato was unable to complete the sigmoidoscopies, it was defendant's responsibility to resolve the concern raised by Dr. Heffernon's report that Bromme had an adenocarcinoma. The failure to perform additional tests also was a likely cause of the failure to timely diagnose the colon cancer.

Several doctors testified regarding the surgical cure rate for cancer. Dr. Melvin Shiffman, who specializes in surgery for cancer and allied diseases, stated it was a reasonable medical probability Bromme's June 1980 complaints were caused by the colon cancer. At that time, the tumor probably was confined to the muscle and had not metastasized to the lymph nodes. Had the tumor been removed then, Bromme would have had a 70 to 75 percent probability of survival. Sometime between March and June 1981, the cancer spread to the adjacent lymph nodes. Thereafter, the survival rate dropped to between 35 and 40 percent. Bromme's chances for survival were further decreased when her bowel became obstructed prior to the January 1982 surgery. By that point, her chances of survival were as low as 15 to 17 percent.

According to Dr. Bruce Chosney, a medical oncologist and hematologist who saw Bromme shortly after her January 1982 surgery, the cure rate for cancers with some lymph node involvement is 40 to 50 percent. Because as many as six lymph nodes were involved by the time of Bromme's surgery, her cure rate was less than 40 percent. By "cure," it is meant that the patient will survive for five years without recurrence.

Dr. Gregory Graves, a surgical oncologist, testified the medical literature shows the prognosis is poor for patients with obstructing colon cancers. Dr.

---

[1]As Bromme's executor, he also alleged a survival action for medical malpractice pursuant to Probate Code section 573. However, he dismissed that cause of action prior to trial.

Graves estimated that by January 1982 Bromme faced a surgical cure rate of 30 to 35 percent. He believed the three-month delay of surgery from September 1981 to January 1982 did not affect Bromme's ultimate prognosis.

At the close of plaintiff's case, defendant moved for partial nonsuit "to the extent that [plaintiff's] case rests upon negligence first occurring at a time when [Bromme's] statistical chance of survival was 50 percent or less." The trial court noted there was a question of fact whether defendant was negligent in June 1980 when Bromme's chance of survival was as great as 75 percent. However, the trial court granted nonsuit as to alleged negligence after June 1981 when the Bromme's chance of survival had dropped to no greater than 40 percent. The court stated:

"And I think one thing we have to keep in mind, that this is a death case. And that's important, because we are not talking about compensating [Bromme] for additional testing or mental distress or aggravation or physical problems that she may have had because the doctor didn't properly diagnose her in September of 1981; what we are talking about here is compensating her heirs for her death. And the question is is it more probable than not that the cancer killed her, or that Dr. Pavitt killed her? And statistically, the answer is it's . . . more probable that after June of '81 the cancer killed her than anything the doctor failed to do."

The jury was instructed in accordance with this ruling. After deliberating approximately four hours, it returned a general verdict for defendant as to the allegations of negligence through June 1981. The trial court denied plaintiff's new trial motion for the reasons stated in its ruling on the nonsuit. This appeal followed.

## DISCUSSION

### I

 ██ ██ Plaintiff contends the trial court erred in granting the partial nonsuit because "California recognizes a cause of action for wrongful death even where the decedent had a less-than-50 percent chance for survival."[2] In support of this claim, plaintiff relies on several California cases and authorities from other jurisdictions. As we shall explain, with a single

---

[2]The standard of review of a nonsuit is well established. "A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of the witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and

exception the California cases are inapposite because they do not involve claims for wrongful death. Moreover, the sole wrongful death case contains no meaningful discussion of the issue plaintiff poses. Finally, because the wrongful death cause of action is wholly statutory, the decisions of other jurisdictions provide little assistance in determining the intent of the California Legislature.

The wrongful death cause of action was both created and limited by the Legislature. " 'Before 1862 there was no wrongful death action in this state. [Citation.] In that year the Legislature, following the philosophy of Lord Campbell's Act, and to a substantial extent its phraseology, created such a cause of action. (Stats. 1862, p. 477.)' " (*Justus* v. *Atchison* (1977) 19 Cal.3d 564, 572 [139 Cal.Rptr. 97, 565 P.2d 122], quoting *Buckley* v. *Chadwick* (1955) 45 Cal.2d 183, 190-191 [288 P.2d 12], fn. omitted.) In *Justus*, the California Supreme Court examined the history of this cause of action and concluded "the Legislature intends to occupy the field of recovery for wrongful death. For this reason the remedy remains a creature of statute in California [citations] regardless of whether a cause of action did or did not exist at common law. . . . [¶] Because it is a creature of statute, the cause of action for wrongful death 'exists only so far and in favor of such person as the legislative power may declare.' [Citation.]" (19 Cal.3d at p. 575.)

The legislative declaration appears at Code of Civil Procedure section 377, subdivision (a), which provides in pertinent part:

"When the death of a person is caused by the wrongful act or neglect of another, his or her heirs or personal representatives on their behalf may maintain an action for damages against the person causing the death, . . ." (Further statutory references are to the Code of Civil Procedure unless otherwise specified.)

█ Under section 377, the plaintiff must prove the death was "caused by" the defendant's wrongful act or neglect, i.e., the wrongful act or neglect was a cause in fact of the death. (*Mitchell* v. *Gonzales* (1991) 54 Cal.3d

---

conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor." ' [Citation.] A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be *substantial evidence* to create the necessary conflict.' [Citation.] [¶] In reviewing a grant of nonsuit, we are 'guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff.' [Citation.] We will not sustain the judgment ' "unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law." ' " (*Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948], italics in original.)

1041, 1049 [1 Cal.Rptr.2d 913, 819 P.2d 872]; cf. *Salin* v. *Pacific Gas & Electric Co.* (1982) 136 Cal.App.3d 185, 190 [185 Cal.Rptr. 899].) To be a cause in fact, the wrongful act must be "a substantial factor in bringing about" the death. (*Mitchell, supra,* at pp. 1052-1053; Rest.2d Torts, § 431, subd. (a), p. 428; BAJI No. 3.76; see Prosser & Keeton on Torts (5th ed. 1984) § 41, pp. 263-268.)

Ordinarily, "the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent." (Rest.2d Torts, § 432, subd. (1), p. 430; see 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 968, pp. 358-359.) However, "[i]f two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about." (Rest.2d Torts, § 432, subd. (2), p. 430.)

This case involves two forces: Bromme's cancer and defendant's alleged failure to diagnose and treat the disease in a timely manner. Therefore, in order to establish that defendant's negligence was a "substantial factor" in causing Bromme's death, plaintiff had to prove the negligence was of itself sufficient to bring about that harm. Defendant's nonsuit notion, which posited that plaintiff's proof of causation was insufficient as to alleged negligence occurring after June 1981, raises the issue of the quantum of proof required for plaintiff to show causation.

"The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case. [Citations.] That there is a distinction between a reasonable medical 'probability' and a medical 'possibility' needs little discussion. There can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or disease. A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury. [Citation.]" (*Jones* v. *Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402-403 [209 Cal.Rptr. 456]; accord, *Dumas* v. *Cooney* (1991) 235 Cal.App.3d 1593, 1603 [1 Cal.Rptr.2d 584]; *Simmons* v. *West Covina Medical Clinic* (1989) 212 Cal.App.3d 696, 702 [260 Cal.Rptr. 772]; *Morgenroth* v. *Pacific Medical Center, Inc.* (1976) 54 Cal.App.3d 521, 532-533 [126 Cal.Rptr. 681]; 6 Witkin, *op. cit. supra,* § 967, p. 357.)

It follows that, in order to show Bromme's death was "caused by" defendant's medical negligence within the meaning of section 377, plaintiff

had to establish a "reasonable medical probability" that the negligence was sufficient of itself to bring about the death, i.e., the death was "more likely than not" the result of the negligence. (*Jones, supra,* 163 Cal.App.3d at pp. 402-403.)

The trial court correctly concluded plaintiff did not meet this burden of proof with respect to any negligence after June 1981. The expert witnesses agreed that Bromme's chance of surviving the colon cancer was less than 50 percent after June 1981. Even with proper medical intervention, it was more likely than not she would die from the cancer. Because proper care after June 1981 would not have averted Bromme's death, the absence of such care was not of itself sufficient to bring about her death. Consequently, defendant's alleged negligence after June 1981 was not a substantial factor (cause in fact) of Bromme's death. (Rest.2d Torts, § 432, p. 430.)

Plaintiff disagrees, claiming "no particular percentage of cause need be established before the question properly is given to the jury." According to plaintiff, causation need be established only "by substantial, i.e., credible, evidence . . . ." He relies in part on *Burford* v. *Baker* (1942) 53 Cal.App.2d 301 [127 P.2d 941], in which the defendant physician failed to diagnose a hip injury and advised the plaintiff to exercise his leg as much as possible. The injury healed improperly, and the plaintiff was permanently disabled. *(Id.,* at pp. 304-305.) On appeal from a judgment for the plaintiff, the defendant claimed there was no evidence his negligence was the proximate cause of the plaintiff's injury because there was no evidence that proper diagnosis and treatment would have produced a better result. *(Id.,* at p. 306.) *Burford* disagreed, noting there was evidence that "rapid reduction and immobilization," as opposed to exercise, would "greatly enhance the probability of a good result." *(Id.,* at p. 307.)

Because the evidence in *Burford* showed a *probability* of a better result, the case is not authority for the proposition that proof by a mere possibility is sufficient. (See *Dumas, supra,* 235 Cal.App.3d at p. 1603.)

*Burford* also held that, where several factors contribute to an injury, the defendant cannot escape liability simply because the precise contribution of each cause cannot be determined. (53 Cal.App.2d at p. 308.)

This holding does not aid plaintiff. The issue presented in this case is not the degree to which defendant's post-June 1981 acts may have contributed to Bromme's death, but the degree of certainty as to whether those acts contributed at all. The evidence established it was probable Bromme would have died even if her cancer had been diagnosed in June 1981. Thus, it was

more likely than not the failure thereafter to diagnose Bromine's cancer did not contribute to her death.

Similarly, plaintiff's reliance on *Cullum v. Seifer* (1969) 1 Cal.App.3d 20 [81 Cal.Rptr. 381] (disapproved on other grounds in *Scala v. Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359, 364 [90 Cal.Rptr. 592, 475 P.2d 864], fn. 1, 370) is misplaced. In *Cullum*, the defendant physician failed to perform timely a biopsy on walnut-sized lymph nodes on the plaintiff's neck. It later was determined the nodes were malignant and the cancer had spread to the entire lymphatic system. The plaintiff's medical malpractice action was "grounded on the theory that defendant should have more promptly diagnosed and treated plaintiff, which would have resulted in the arrest and possible cure of the malignant disease." *(Id.*, at p. 23.) After the jury rendered a verdict for the defendant, the trial court granted the plaintiff's motion for new trial. On appeal, the defendant claimed the evidence was insufficient to support the new trial order because there was no evidence of negligence and proximate causation. *Cullum* disagreed, finding among other things the plaintiff's expert "was able to say *with reasonable medical probability* that the disease had not affected other lymph areas prior to June 10, 1965 and that 'a delay would make her need more treatment.' " *(Id.*, at p. 26, italics added.) The delay itself prevented more certain proof that, had the disease been treated earlier, the disease would have been cured. "Hence, of necessity, in determining the question courts and juries must rely upon the testimony of properly qualified physicians for such testimony as will in the minds of the jury establish the fact in issue to a reasonable certainty. Such evidence must be clearly distinguished from conjecture, or that which merely establishes a possibility of future trouble." *(Ibid.)* Because there was "testimony throughout the record . . . which, if believed, would support the inference that it is a reasonable medical probability that the plaintiff would have benefited, i.e., by possible lengthening of her life and/or her personal comfort—even if no cure would have resulted from more prompt diagnosis and treatment," the order granting the plaintiff a new trial was affirmed. *(Id.*, at p. 28.)

Because *Cullum* was not a section 377 wrongful death action, the plaintiff did not have to prove the negligent medical treatment resulted in death. Thus, it was irrelevant that more prompt diagnosis and treatment would not have cured the disease. Here, in contrast, the gravamen of plaintiff's complaint is that defendant's malpractice was a cause in fact of Bromme's death. *Cullum* does not obviate plaintiff's statutory burden to show that malpractice was a substantial factor in the decedent's death. Moreover, *Cullum*'s gratuitous use of the word "possible" in describing how the plaintiff would have benefited from proper care does not undermine its holding, consistent with

the above-noted authorities, that medical negligence must be proven to a reasonable medical *probability.*

Plaintiff also cites *Pulvers* v. *Kaiser Foundation Health Plan, Inc.* (1979) 99 Cal.App.3d 560 [160 Cal.Rptr. 392] for the proposition that a cause of action for wrongful death exists where the decedent had less than a 50 percent chance of surviving regardless of the defendant's negligence. In *Pulvers*, a wrongful death action, the jury received an instruction (derived from *Cullum)* that "[l]iability for negligence in providing medical care may be based upon an inference that it is a reasonable medical probability that the decedent would have . . . benefited, . . . by possible lengthening of his life . . . even if no cure would have resulted from more prompt diagnosis and treatment." *(Id.,* at pp. 565-566.) The jury returned a verdict for the plaintiff, but the trial court ordered a new trial. On appeal, the defendant argued the new trial order was appropriate, asserting that *Cullum* was distinguishable because it was an action for personal injury rather than wrongful death. *Pulvers* rejected this claim, explaining:

"It is true, as the defendants argue, that the damages in a wrongful death case are different from those in a personal injury action. That distinction was recognized by the court's deletion from the *Cullum* language of the phrase 'and/or his personal comfort.' The jury was elsewhere properly instructed as to the factors that it could consider in fixing damages. Of the three elements required in a malpractice suit—negligence, causation and damage—the instruction here involved dealt with only the second—causation—it did not foreclose, and could not reasonably be construed as affecting, the jury's obligation to also make findings favorable to plaintiffs on the other two elements, on both of which they were fully instructed. The giving of the instruction, as amended by the trial court, was not error." (99 Cal.App.3d at p. 566, italics and fns. omitted.)

*Pulvers* did not consider the language of section 377 which provides that a wrongful death action lies "[w]hen the death of a person *is caused by* the wrongful act or neglect of another." (Italics added.) Thus, *Pulvers* does not stand for the proposition that the instruction disputed in that case is consistent with section 377. (E.g., *People* v. *Harris* (1989) 47 Cal.3d 1047, 1071 [255 Cal.Rptr. 352, 767 P.2d 619].) By approving a wrongful death recovery where the cause of death was a preexisting disease and the lengthening of life was a mere "possibility" had the physician not been negligent, *Pulvers* extended wrongful death liability beyond the bounds set by the Legislature. (See *Dumas, supra,* 235 Cal.App.3d at p. 1611.) For reasons explained later in this opinion, we decline to follow *Pulvers*'s lead.

Next, plaintiff cites *Armstrong* v. *Svoboda* (1966) 240 Cal.App.2d 472 [49 Cal.Rptr. 701] as "instructive on the issue of proximate cause related to a

claim of delayed diagnosis." In *Armstrong*, the defendant physician obtained an abnormal electrocardiogram but informed the plaintiff that he may have a stomach disorder. For several days the condition went untreated, and eventually the plaintiff required open heart surgery. The evidence suggested the defendant knew or should have known of the heart condition considerably before he hospitalized the plaintiff, and prompt hospitalization would have minimized the heart damage. (*Id.*, at pp. 474-476.)

While *Armstrong* did not require the plaintiff to prove he would have been completely cured had he received timely treatment, the opinion does not obviate the need for a plaintiff to prove that a defendant's negligence was a cause in fact of injury. That requirement was satisfied in *Armstrong* by evidence from which the jury could draw an inference that the defendant's delay in properly treating the plaintiff caused additional heart damage. (240 Cal.App.2d at pp. 476-477.)

Plaintiff also relies on *Keen* v. *Prisinzano* (1972) 23 Cal.App.3d 275 [100 Cal.Rptr. 82]. In *Keen*, the defendant physician did not discover the full extent of a fracture to the plaintiff's heel and placed the foot in a cast but did not pin the fracture. In reversing a nonsuit for the defendant, *Keen* noted a jury reasonably could conclude from the evidence that, if the defendant had properly diagnosed the fracture, he would have treated it by pinning instead of casting, and that pinning *probably* would have left the plaintiff with less residual disability. *(Id.*, at p. 281.)

Plaintiff argues: "Had it been necessary for the plaintiff to prove that the probability of a better result was more than 50 percent, there could not have been a reversal because that evidence was not presented." Plaintiff is wrong. By noting the evidence was sufficient to support a finding that pinning the foot *probably* would have reduced the plaintiff's residual disability, *Keen* necessarily concluded the evidence was sufficient to support a finding that, had the defendant not been negligent, a lesser degree of disability was more likely than not. (See *Jones*, *supra*, 163 Cal.App.3d at p. 403.)

Plaintiff places great reliance on *James* v. *United States* (N.D.Cal. 1980) 483 F.Supp. 581. In *James*, the plaintiff's 1976 chest X-ray revealed an abnormality which the radiologist's report termed a possible cancer. Due to clerical error, neither the X-ray nor the report was seen by the plaintiff's physician. In 1978 the plaintiff experienced chest pains and other symptoms. X-rays and exploratory surgery revealed a large cancerous tumor. Following radiation therapy, the cancer went into remission. In the plaintiff's action for personal injuries, the federal district court ruled that an individual "may be compensated for any aggravation of his injury or shortening of his life span

proximately caused by the defendant's negligence, even though other factors contributed to or caused the initial condition." (*Id.*, at p. 586.) After stating the evidence must establish "a reasonable probability" that the defendant's negligence caused the plaintiffs to be "worse off," *James* noted the defendant's expert witness had acknowledged the plaintiff's chance of survival would have been greater had he first been treated in 1976 rather than 1978. (*Id.*, at pp. 585-586.) The plaintiff's experts agreed the tumor probably had metastasized since 1976, and earlier radiation treatment would have reduced its size and the risk of metastasis. (*Id.*, at p. 587.) Based on this evidence, *James* found the plaintiff sustained his burden of proving that he "would have benefited from early treatment, i.e., that discovery and disclosure in 1976 would have offered at least a chance that the tumor could be successfully treated and, even if not cured, its growth arrested or slowed. As a proximate cause of defendant's negligence, James was deprived of the opportunity to receive early treatment and the chance of realizing any resulting gain in his life expectancy and physical and mental comfort. No matter how small that chance may have been—and its magnitude cannot be ascertained—no one can say that the chance of prolonging one's life or decreasing suffering is valueless." (*Ibid.*)

Assuming for the purpose of discussion that *James* accurately states California law (but see *Dumas, supra,* 235 Cal.App.3d 1593), the case does not assist plaintiff.

In *James,* a personal injury action brought under the Federal Tort Claims Act, the issue was whether the plaintiff would have benefited from earlier treatment. The expert witnesses agreed he would have so benefited. The fact the plaintiff could not identify precisely *how* he would have benefited, i.e., whether the tumor might have been operable if detected in 1976, or whether early radiation treatment might have prevented or reduced its metastasis, was of no consequence because the court ruled the plaintiff could rely on "general theories of appropriate medical treatment" to show that he would have benefited from earlier treatment. (483 F.Supp. at p. 586.)

In this wrongful death action, however, the issue is not whether Bromme's life might have been prolonged or her suffering lessened if defendant had diagnosed her cancer in June of 1981. Rather, the issue is whether defendant's failure to discover the cancer after that time was a substantial factor in causing Bromme's death. Plaintiff did not satisfy this burden because the uncontradicted evidence established that Bromme's chance of surviving the cancer after June 1981 was less than 50 percent even if defendant had not been negligent, i.e., that it was not medically probable defendant's alleged negligence after June 1981 was a substantial factor in causing Bromme's death.

Closely on point is the wrongful birth/wrongful life case of *Simmons* v. *West Covina Medical Clinic*, *supra*, 212 Cal.App.3d 696. In *Simmons*, the defendant physician failed to give the plaintiff expectant mother a test which might have shown that her fetus had Down's Syndrome. The evidence showed the test had only a 20 percent likelihood of detecting the syndrome. *(Id.*, at pp. 699-700.) Thus, the trial court granted the defendant's summary judgment motion since there was less than a 50 percent chance the test would have detected the disease. *(Id.*, at p. 700.) *Simmons* affirmed the judgment because there was no " 'reasonable medical probability based on competent expert testimony' " that the failure to conduct the test deprived the plaintiff of the opportunity to terminate her pregnancy. *(Id.*, at p. 702, quoting *Jones*, *supra*, 163 Cal.App.3d at p. 402.)

Contrary to plaintiff's contention, *Simmons* utilized "50 percent" as a "benchmark" for a finding of proximate cause in so-called wrongful life cases: "A less than 50-50 possibility that defendants' omission caused the harm does not meet the requisite reasonable medical probability test of proximate cause." (212 Cal.App.3d at pp. 702, 703.)

 *Simmons* restates the well-established principle that causation in actions arising from medical negligence must be proven within a reasonable medical probability based on competent expert testimony, i.e., something more than a "50-50 possibility." *(Jones*, *supra*, 163 Cal.App.3d at pp. 402-404;[3] *Morgenroth*, *supra*, 54 Cal.App.3d at pp. 532-533 [proximate cause must be established by evidence that a result was more likely than not to have been caused by an act].)

-██ It follows that California does not recognize a cause of action for wrongful death based on medical negligence where the decedent

---

[3] In *Jones*, the plaintiff claimed her ingestion of birth control pills caused or accelerated the progression of her uterine cancer. One expert testified there was a "reasonable medical possibility," defined as less than a 50-50 chance, the drug contributed to the cancer. (163 Cal.App.3d at p. 401.) The other expert was unwilling to say the drug was a cause of the cancer but stated it may have been a contributing factor to the progression of the disease. *(Ibid.*) The trial court granted the defendant's nonsuit motion, and *Jones* affirmed, stating: "the only reasonable inference which can be drawn from the evidence is that the proximate cause of plaintiff's condition remains unknown and unproved." *(Id.*, at p. 404.)

Plaintiff claims *Jones* requires nothing more than "a sufficient degree of certainty so the jury is not merely speculating as to whether there is *any* connection between the defendant's conduct and the condition at issue." (Italics in original.) We disagree. As noted, *Jones* requires the plaintiff to show that the injury was more likely than not the result of the defendant's negligence, i.e., something more than a "50-50 possibility." (163 Cal.App.3d at pp. 402-404.)

did not have a greater than 50 percent chance of survival had the defendant properly diagnosed and treated the condition.[4]

Nevertheless, plaintiff suggests that as a matter of "public policy" the law should not limit wrongful death actions "only to those cases where the death was more likely than not, i.e., by greater than a 50-50 chance, caused by a defendant doctor." This is so, he contends, because a contrary result would "immuniz[e] negligence perpetrated against those who have life-threatening diseases." Plaintiff argues: "Medical practitioners cannot be permitted to escape liability simply because the patient had a preexisting condition or was already terminally ill. If this were the case it would make for 'open season' on the aged and infirm who would have no redress for medical negligence. . . . Simply because a patient's disease may limit the statistical chances of recovery or cure below 50 percent, does not mean doctors are free to treat them negligently. . . . To deny plaintiffs the right to recover for loss of chance is to sanction negligent medical care."

Virtually the same argument was made in *Dumas, supra,* 235 Cal.App.3d 1593, a medical malpractice action predicated on delayed diagnosis and treatment of lung cancer. In *Dumas,* the plaintiff claimed he was entitled to damages for the lost chance of a possible cure, possible lengthening of life or possible improved physical comfort even if the evidence showed less than a probability that the defendant caused such loss.

In rejecting this contention, *Dumas* acknowledged the concern that the traditional rule of causation (a reasonable medical probability) bars tort recovery by survivors of many terminally ill patients no matter how blatant the health care provider's negligence. On the other hand, *Dumas* recognized there are countervailing policy arguments which dictate against extending liability to situations where it is not medically probable the physician's negligence caused the harm alleged. (235 Cal.App.3d at pp. 1607-1610.) We

---

[4]Plaintiff relies on several out-of-state authorities for the proposition that a medical patient may recover for the "loss of chance" of survival even though the evidence establishes only a possibility that competent care would have yielded a more favorable result. (See cases collected in Anno., Medical Malpractice: "Loss of Chance" Causality (1987) 54 A.L.R.4th 10.) However, the out-of-state cases shed little light on what the California Legislature intended in providing a cause of action "[w]hen the death of a person *is caused by* the wrongful act or neglect of another . . . ." (§ 377, subd. (a), italics added.) "Because the cause of action for wrongful death is based on statute in all states—with the apparent exception of Massachusetts—little would be gained by analyzing the numerous decisions of our sister jurisdictions on the topic. [Citation.] 'For when the last word shall have been said in such a consideration, the paramount fact will still remain that rights under our section 377 of the Code of Civil Procedure are to be defined not by what other courts have said touching their own statutes, but from the meaning and intent of our own law derived from a reading of it.' " (*Justus, supra,* 19 Cal.3d at p. 577.)

need not repeat the court's elaboration on each policy argument. Simply stated, *Dumas* observed that relaxation of the traditional causation requirement may "encourage a proliferation of defensive medicine, an escalation of medical costs, and an unwarranted expansion of liability exposure" with "troubling implications." (235 Cal.App.3d at pp. 1608, 1609.)

We agree with *Dumas* that the "disagreement on such weighty matters of public policy militates against judicial tampering with the long-standing meaning of causation in deference to legislative consideration of the issue." (235 Cal.App.3d at p. 1608; accord *Simmons*, *supra*, 212 Cal.App.3d at pp. 705-706 ["[Courts should] refuse to expand the circle of liability by abandoning established tort principles of causation where there is only a mere possibility of detecting [a] genetic defect. [Courts] do not wish to intrude upon the Legislature's task of weighing such matters of public policy, and leave it to the function of deciding whether to provide a remedy for those genetically defective children and their parents who are unable to prove to a reasonable medical certainty that medical negligence deprived the mother of the chance to terminate her pregnancy."].)

In another effort to overturn the trial court's ruling granting partial nonsuit, plaintiff suggests the jury could have inferred from the testimony of Dr. Shiffman that it was defendant's negligent care which proximately caused Bromme's chance of survival to decrease from over 70 percent to less than 50 percent. However, the partial nonsuit related only to the period after June 1981, when Bromme's chance of survival had fallen below 50 percent. The ruling did not preclude the jury from considering whether defendant was negligent prior to that time and, if so, whether the negligence was a cause in fact of Bromme's death. The jury simply found that plaintiff's evidence on that issue was not persuasive.

## II

█ Plaintiff's next argument rests on the statistical fact that after June 1981 there was a *chance* Bromme would have survived had her cancer been diagnosed and properly treated. Plaintiff contends the jury should have been permitted to determine whether Bromme would have beaten the odds and survived; if the jury so found, plaintiff was entitled to damages for Bromme's wrongful death. The obvious problem with this argument is that neither the jury, an expert witness, nor medical science in general has any meaningful way to determine whether Bromme would have survived other than by reference to historical experience. The best that the medical experts could do was state that less than half (35 to 40 percent) of the persons whose cancers approximate that which Bromme had in June 1981 will survive. In deciding

whether Bromme would have been among the survivors or the victims, the jury could only speculate. Hence, plaintiff was not entitled to a jury "determination" of that issue.

## III

Plaintiff complains that, in granting the partial nonsuit, the trial court "concluded that [defendant] was not *the* proximate cause of Mrs. Bromme's death. The trial court had not considered, or more importantly, had not permitted the jury to consider, whether [defendant's] care was *a* proximate cause of Mrs. Bromme's reduced chance of survival or opportunity for treatment, which is a cognizable injury for which [plaintiff] was entitled to be compensated." (Italics in original, fn. omitted.) (See *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 586 [146 Cal.Rptr. 182, 578 P.2d 899].)

If plaintiff means he is entitled to be compensated for Bromme's reduced "chance of survival" or "opportunity for treatment" even though the reduction did not lead to her death, plaintiff is mistaken. This is a wrongful death action: in order to recover, the plaintiff must prove the defendant's conduct was a substantial factor *in causing the decedent's death.* The Legislature has not extended the statutory cause of action to permit recovery where this predicate is not established. The trial court correctly determined defendant's post-June 1981 conduct was not a substantial factor in Bromme's death; no further inquiry was required.

If plaintiff means the trial court failed to consider whether defendant's conduct was a proximate cause of the decedent's death, the record fails to support the contention. The trial court's remarks do not suggest it searched for a single probable cause of death to the exclusion of all others. Rather, its remarks reflect the expert testimony that after June 1981 it is not medically probable that proper diagnosis and treatment would have saved the decedent's life. Thus, the want of such diagnosis and treatment was not a cause in fact of Bromme's death.

Plaintiff acknowledges that section 581c, subdivision (b), permits the trial court to grant a partial nonsuit where the evidence supports the motion as to some but not all of the issues in an action. He contends, however, the trial court's order was erroneous because it was directed not to an entire element of his cause of action but only to a portion of the element of causation. Plaintiff cites no authority for his novel contention, and we are not aware of any.

Anticipating *Mitchell, supra,* 54 Cal.3d 1041, 1052-1053, plaintiff contends the jury should have been permitted to consider whether defendant's

treatment was a "substantial factor" in Bromme's death. We already have acknowledged the correctness of the "substantial factor" test. However, we also have concluded the nonsuit was proper because plaintiff's evidence on the issue was insufficient.

Plaintiff claims his contention is supported by Civil Code section 1714.8, subdivision (a), which provides:

"No health care provider shall be liable for professional negligence or malpractice for any occurrence or result solely on the basis that the occurrence or result was caused by the natural course of a disease or condition, or was the natural or expected result of reasonable treatment rendered for the disease or condition. This section shall not be construed so as to limit liability for failure to inform of the risks of treatment or failure to accept treatment, or for negligent diagnosis or treatment or the negligent failure to diagnose or treat."

As plaintiff notes, this statute implicitly recognizes that a health care provider may be liable for a negligent failure to diagnose or treat a potentially fatal disease. However, this statute does not undermine the requirement of section 377 that the wrongful death must be "caused by" the defendant's conduct, i.e., the conduct must be a substantial factor in bringing about the death. As to defendant's post-June 1981 conduct, plaintiff failed to prove that element of his cause of action. Consequently, the partial nonsuit was properly granted.

## IV

"Assuming for argument only that [defendant] had no liability unless he was negligent before Mrs. Bromme's chance of survival decreased below 50 percent, [plaintiff contends] the court erred in choosing June 1981 as the cut-off date because the testimony established that Mrs. Bromme's chance of surviving the cancer decreased below 50 percent sometime between March and September 1981. The testimony was that, as of September 1981, it was probable that her chance of survival, assuming treatment was then provided (which it was not) would have been approximately 40 percent. Thus, it was error to instruct, contrary to the evidence, that Mr. Bromme had to have shown negligence between June 1980 and June 1981, when the instruction should have extended to September 1981."

However, at the hearing on the motion for partial nonsuit, plaintiff voiced no objection to the trial court's conclusion that the evidence established Bromme's chance of survival had dropped below 50 percent by the end of

June 1981. Having acquiesced in this date, plaintiff is not entitled to challenge it on appeal. (See *People* v. *Spinks* (1961) 190 Cal.App.2d 366, 368 [11 Cal.Rptr. 923].)

In any event, the date is supported by the evidence. Dr. Shiffman testified the cancer probably had spread from the colon to the surrounding lymph nodes sometime between March and June of 1981. Thereupon, the tumor was classified as a C-1. Dr. Shiffman stated persons with a C-1 tumor have a survival rate of less than 50 percent. According to Dr. Shiffman, after June 1981 Bromme's chance of survival dropped to between 35 and 40 percent. The trial court properly deduced from the testimony of Dr. Shiffman and other experts that June 1981 was the last point defendant's negligence could have caused Bromme's death.

V

Plaintiff requested that the jury be instructed with BAJI No. 3.76 which provides:

"A legal cause of [injury] [damage] [loss] [or] [harm] is a cause which is a substantial factor in bringing about the [injury] [damage] [loss] [or] [harm]."

However, the jury was instructed with BAJI No. 3.75 which provides:

"A proximate cause of injury, death, damage, loss or harm is a cause which, in natural and continuous sequence, produces the injury, death, damage, loss or harm and without which the injury, death, damage, loss or harm would not have occurred."

Plaintiff contends it was error to instruct with BAJI No. 3.75.[5] He is correct. BAJI No. 3.75, the so-called proximate cause instruction, has been disapproved by the California Supreme Court. (*Mitchell, supra,* 54 Cal.3d at p. 1054.)

We next consider whether the error was prejudicial. Under our state Constitution, we must determine whether it is reasonably probable a result

---

[5]Defendant urges us to reject this contention because plaintiff withdrew his request for BAJI No. 3.76 and proposed BAJI No. 3.75 instead. We disagree. The transcript of the new trial hearing indicates plaintiff withdrew his request for BAJI No. 3.76 in the face of the trial court's remarks suggesting the instruction was inappropriate in this case. Because plaintiff withdrew his request at the trial court's behest, we cannot conclude that he voluntarily assented to BAJI No. 3.75. We acknowledge the trial court's copy of BAJI No. 3.75 indicates it was requested by both parties. However, at the new trial hearing, plaintiff stated without opposition that the instruction was given over his objection. Besides, the giving of an instruction is "deemed excepted to." (§ 647.)

more favorable to plaintiff would have been reached in the absence of the error. *(Mitchell, supra,* 54 Cal.3d at p. 1054.) "Although there is no precise formula for determining the prejudicial effect of instructional error, we are guided by the five factors enumerated in *LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946]." *(Ibid.)*

The first factor is the degree of conflict in the evidence on the issue of cause in fact. (54 Cal.3d at p. 1054.) We conclude the conflict was not substantial. It was undisputed that, when in June 1980 Bromme complained of abdominal pain, constipation, and "difficulties with food," defendant obtained upper gastrointestinal and gallbladder studies but did not order a lower gastrointestinal series and stool test. As a result, the colon cancer went undetected.

During closing argument, defendant conceded that, "[h]ad [Bromme] been diagnosed and operated on in that time frame, more probably than not, she would not have died." *Therefore, the disputed issue was not whether the failure to perform further tests was a cause in fact of Bromme's death, but whether defendant was negligent in failing to order the tests.*

Second, we consider whether the jury asked for a rereading of the erroneous instruction or of related evidence. (54 Cal.3d at p. 1055.) The jury's only request was for a rereading of plaintiff's testimony which, unlike the expert testimony, did not directly relate to cause in fact. The jury did not request a rereading of instructions, but we note that the jury received a copy of the instructions, making such a request unnecessary.

Third, we analyze the closeness of the jury's verdict. (54 Cal.3d at p. 1055.) The nine-to-three verdict was returned after approximately four hours of deliberations. Unlike in *Mitchell,* the jury did not return special verdicts on negligence and causation. Thus, there is no indication whether the jury decided that defendant was not negligent or whether, as in *Mitchell,* they decided his negligence was not a cause in fact of plaintiff's damage. However, that the verdict was returned in only four hours suggests the majority of jurors were not troubled by the causation issue.

Fourth, we consider whether defense counsel's argument contributed to the instruction's misleading effect. (54 Cal.3d at p. 1055.) Although defense counsel referred to causation at several points in his argument, he did not elaborate on the term "proximate" or highlight the concept of "closeness in

time." By arguing that any liability would have to be based on Bromme's visits to defendant between June 1980 and the end of June 1981, defense counsel actually dispelled any notion that defendant could be liable only for his temporally "proximate" conduct. Defense counsel summarized the causation issue by asserting that, in order to return a verdict for plaintiff, the jury would have to "decide that [ordering the study] would have led to a surgical resection in a time frame that would have made it more probable than not that she would have lived; that he was the proximate cause of her death." It is doubtful whether "substantial factor" language would have materially improved upon this summation.

As previously noted, defense counsel's principal argument related to the disputed issue of negligence prior to June 1981. Plaintiff had pointed to expert testimony which opined that the appropriate standard of medical care called for further testing when the upper gastrointestinal and gallbladder studies were negative. Defendant retorted that he should not be found negligent because, after he received the study results which showed no problems with Bromme's upper gastrointestinal system and gallbladder, discussed the studies with Bromme in June 1980, and recommended she drink fruit juices and take Metamucil, Bromme made no further complaints of abdominal pain or bowel problems to defendant until after June 1981, a point at which his negligence no longer was in question because the cancer had progressed to a point it was medically probable that proper diagnosis and treatment would not have saved Bromme's life.

Because the principal argument related to negligence rather than causation, it is unlikely the argument contributed to the misleading effect of BAJI No. 3.75.

Finally, we consider the effect of other instructions in remedying the error. (54 Cal.3d at p. 1055.) None of the other instructions remedied the confusion which is inherent in BAJI No. 3.75. However, because the jury was not instructed with BAJI No. 3.77, it did not hear the frequent repetitions of the phrase "probable cause" and was not told the cause must have "been operative at the moment of injury." The possibility of confusion was less than in *Mitchell.* (54 Cal.3d at p. 1055.)

As submitted to the jury, this case did not involve competing causes, a causation issue that was seriously in dispute, multiple confusing instructions, misleading arguments by counsel or lengthy jury deliberations. Under the circumstances, we conclude it is not reasonably probable a result more favorable to appellant would have been reached had the jury been instructed with BAJI No. 3.76 rather than BAJI No. 3.75. (54 Cal.3d at p. 1054.)

## DISPOSITION

The judgment is affirmed.

Sims, Acting P. J., and Nicholson, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 27, 1992. Lucas, C. J., Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.